IN THE SUPREME COURT OF THE STATE OF DELAWARE

TRACEY WEINBERG, §
§
 Plaintiff Below, Appellant, § No. 274, 2022
§
v. §
§ Court Below: Court of Chancery
WAYSTAR, INC., DERBY TOPCO § of the State of Delaware
INC., DERBY TOPCO PARTNERSHIP §
LP and DERBY GP, LLC, § C.A. No. 2021-1023
§
 Defendants Below, Appellees. §

Submitted: January 18, 2023
Decided: March 16, 2023

Before **SEITZ**, Chief Justice; **VALIHURA**, and **VAUGHN**, Justices.

Upon appeal from the Court of Chancery. **AFFIRMED**.

Steven P. Wood, Esquire, (*argued*), Andrew S. Dupre, Esquire, Travis J. Ferguson, Esquire, McCarter & English, LLP, Wilmington, Delaware for Appellant.

Kevin M. Gallagher, Esquire, Caroline M. McDonough, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware. *Of Counsel*: Sarah A. Zielinski, Esquire, (*argued*), Amy Starinieri Gilbert, Esquire, McGuire Woods LLP, Chicago, Illinois for Appellee.

**VALIHURA**, Justice:

This appeal turns on the meaning of the word "and" in three distinct, but related, option agreements. Specifically, the question is whether two separate events (separated by the word "and") must both occur in order for the company to exercise a call right, or whether the call right may be exercised if only one event has occurred. Plaintiff-below, Appellant Tracey Weinberg ("Weinberg") is the former Chief Marketing Officer of defendant-below, Appellee Waystar, Inc., a Delaware corporation ("Waystar"). During her employment at Waystar, the company granted her options to purchase stock in its co-defendant Derby TopCo, Inc., a Delaware corporation ("Derby Inc."), pursuant to a Derby TopCo 2019 Stock Incentive Plan (the "Plan"). Weinberg was awarded three option grants under the Plan pursuant to three option agreements executed between October 2019 and August 2020 (the "Option Agreements"). By the time Weinberg was terminated on August 16, 2021, 107,318.96 of her options had vested. She timely exercised all of them on November 12, 2021, and the options immediately converted to economically equivalent partnership units in co-defendant Derby TopCo Partnership LP, a Delaware limited partnership ("Derby LP") (the "Converted Units").

Each Option Agreement contains an identical call right provision providing Appellees (defined below) the right to repurchase Weinberg's Converted Units (the "Call Right"), "during the six (6) month period following (x) the (i) [t]ermination of [Weinberg's] employment with the Service Recipient for any reason . . . *and* (y) a Restrictive Covenant Breach."[1] On approximately November 18, 2021, five days after

---

[1] App. to Opening Br. at A56 (First Option Agreement § 10(a), at 5), A68 (Second Option Agreement § 10(a), at 6), A86 (Third Option Agreement § 10(b), at 6) (emphasis added). A

2

Weinberg exercised her options, Appellees exercised the Call Right and repurchased all of Weinberg's Converted Units. Although Weinberg had been terminated within the time frame specified by the Call Right Provision (defined below), a Restrictive Covenant Breach had not occurred. The parties dispute whether the Call Right is available in the absence of a Restrictive Covenant Breach. The Vice Chancellor decided that it was. Weinberg filed suit against Appellees, and Appellees filed a counterclaim, to resolve whether Appellees validly exercised the Call Right under the Option Agreements. Weinberg appeals the Court of Chancery's judgment.

For the reasons set forth below, we **AFFIRM** the judgment of the Court of Chancery.

## I. RELEVANT FACTS AND PROCEDURAL BACKGROUND[2]

A. *The Option Agreements*

Weinberg began working for Waystar in July 2018. During her approximately three-year employment with Waystar, Waystar awarded her three option grants under the Plan. Each was governed by a distinct Option Agreement: (i) a Substitute Option Agreement, dated October 22, 2019 (the "First Option Agreement"); (ii) an Option Agreement, dated October 23, 2019 (the "Second Option Agreement"); and (iii) an Option Agreement, dated August 9, 2020 (the "Third Option Agreement"). Each Option

---

"Restrictive Covenant Breach" is defined as a breach of the restrictive covenant agreement attached as an exhibit to each Option Agreement. *Id.* at A54 (First Option Agreement § 2(e)(iv), at 3), A65 (Second Option Agreement § 2(c)(xi), at 3), A83 (Third Option Agreement § 2(c)(xi), at 3).

[2] Unless otherwise noted, facts are taken from the Court of Chancery's memorandum opinion. *See Weinberg v. Waystar, Inc.* (*Chancery Opinion*), 2022 WL 2452141 (Del. Ch. July 6, 2022).

Agreement granted to Weinberg the option to purchase shares of common stock in Derby Inc. Once Weinberg exercised the options, the Derby Inc. stock would automatically convert into Converted Units.

### 1. *The Call Right*

Section 10(a) of the First and Second Option Agreement, and Section 10(b) of the Third Option Agreement (the "Call Right Provision") provides Appellees with the right to repurchase Weinberg's Converted Units. It reads:

> The Converted Units shall be subject to the right of repurchase (the "Call Right") exercisable by Parent, a member of the Sponsor Group, or one of their respective Affiliates, as determined by Parent in its sole discretion, during the six (6) month period following (x) the (i) the Termination of [Weinberg's] employment with the Service Recipient for any reason (or, if later, the six (6) month anniversary of the date of the exercise of the [Substitute] Options in respect of which the Option Stock was issued, ***and*** (y) a Restrictive Covenant Breach. The Call Right shall expire on the earlier of (i) an Initial Public Offering or (ii) a Change of Control.[3]

The Call Right provision in the First Option Agreement includes the word "Substitute," but it is otherwise identical to the Call Right provision in the Second and Third Option Agreements.[4]

### B. *Waystar Terminates Weinberg*

On August 16, 2021, Waystar terminated Weinberg without cause. On the date of her termination, 89,318.96 of the options under the First Option Agreement had vested;

---

[3] App. to Opening Br. at A56 (First Option Agreement § 10(a), at 5), A68 (Second Option Agreement § 10(a), at 6), A86 (Third Option Agreement § 10(b), at 6) (emphasis added). "Service Recipient" means the principal employer of the award recipient. *Id.* at A50 (App. A to the Plan). We note that all three agreements are missing the closing parenthesis following "(or, if later . . . ."

[4] *Id.* at A56 (First Option Agreement § 10(a), at 5).

16,000 of the options under the Second Option Agreement had vested; and 2,000 of the options under the Third Option Agreement had vested. Under each Option Agreement, Weinberg had 90 days from the date of her termination without cause to exercise the vested options. On November 12, 2021, within 90 days of her termination, Weinberg elected to exercise all of her vested options. She purchased 107,318.96 shares of Derby Inc. common stock, which were immediately converted into Converted Units in Derby LP, for a total purchase price of $898,756.74.

### C. Waystar Exercises its Call Right

On approximately November 18, 2021, Appellees exercised the Call Right and repurchased all of Weinberg's Converted Units for a total purchase price of $1,824,422.32. The parties agree that, as of this date, Weinberg had been terminated without cause and that a Restrictive Covenant Breach had not occurred.

### D. Weinberg Files Suit

Five days after Appellees exercised the Call Right, on November 23, 2021, Weinberg sued Waystar and its affiliates Derby LP, Derby Inc, and Derby GP, LLC (collectively, "Appellees"), in the Court of Chancery. She sought, among other things, a declaratory judgment that Appellees breached the Option Agreements by exercising the Call Right, and an injunction enjoining Appellees from asserting the Call Right. The parties cross-moved for judgment on the pleadings. The Court of Chancery heard oral argument on April 20, 2022. Following supplemental letter submissions, it issued its memorandum opinion on July 6, 2022, granting Appellees' Motion for Judgment on the Pleadings, and entered judgment on July 26, 2022.

Weinberg filed a notice of appeal on August 5, 2022. We heard oral argument on January 18, 2022.

## II. CONTENTIONS ON APPEAL

Weinberg argues that the trial court erred in finding that "and" in the Call Right Provision was meant in its "several" sense. She presents four reasons in support of her contentions: (1) *first*, "and" can only unambiguously mean "or" if the trial court finds an absurd result, which the trial court did not do here;[5] (2) *second*, the Call Right Provision is mandatory, thus, the word "and" must be read conjunctively; (3), *third*, the First Option Agreement governs more than 80% of Weinberg's options and did not contain the provision the Vice Chancellor found would be rendered superfluous by reading "and" in the conjunctive and joint sense; and (4) *finally*, because the Call Right is, at least,

---

[5] Weinberg argues there is a special rule in Delaware requiring us to conclude that construing "and" conjunctively will produce an absurd result before we may interpret "and" disjunctively. Opening Br. at 11–12. However, the cases cited by Weinberg do not support this proposition. Rather, they support the well-established Delaware principle that we interpret the plain language of a contract and enforce its ordinary meaning, as informed by context. *See Le Tourneau v. Consol. Fisheries Co.*, 51 A.2d 862, 865–66 (Del. 1947) (analyzing "and" based upon the interpretation of similar statutes); *Lipman v. GPB Cap. Hldgs. LLC*, 2020 WL 6778781, at *10–11 (Del. Ch. Nov. 18, 2020) (analyzing "and" in limitation of liability provision based on context, including whether reading "and" disjunctively would create "surplusage"); *Stockman v. Heartland Indus. Partners, L.P.*, 2009 WL 2096213, at *14 (Del. Ch. July 14, 2009) ("Although the normal approach to interpretation is to treat "and" as conjunctive and "or" as disjunctive, the opposite approach has been applied where the normal approach would lead to an absurd result *or one contrary to the drafter's overall intent*.") (emphasis added); *Concord Steel, Inc. v. Wilmington Steel Processing Co.*, 2008 WL 902406, at *7 (Del. Ch. April 3, 2008) (identifying three possible approaches for interpreting "and," namely, always conjunctive, inclusive of the disjunctive, or determining the meaning from context, and adopting the third approach of "interpret[ing] each occurrence of 'and' as part of a conjoined list contextually, determining its meaning based on the elements of the list and the surrounding words"); *Blatt v. Concord Mall*, 1982 Del. Super. LEXIS 1049, at *2–4 (Del. Super. Feb. 26, 1982) (analyzing "and" in indemnification agreement based on context and syntax); *State v. Klosowski*, 310 A.2d 656, 657 (Del. Super. 1973) (interpreting "and" in criminal statute in the disjunctive sense based on context and statutory intent).

6

ambiguous, and the Option Agreements are contracts of adhesion, the trial court should have construed the ambiguity against Appellees as the drafters.

## III.    SCOPE AND STANDARD OF REVIEW

Our standard of review of the grant of a motion for judgment on the pleadings "is to determine whether the court committed legal error in formulating or applying legal precepts."[6]  Accordingly, we review the grant of a motion for judgment on the pleadings *de novo*.[7]  The scope of our review is limited to the contents of the pleadings.[8]

## IV.    ANALYSIS

### A. *Delaware Principles of Contract Interpretation*

In addressing the question of how to interpret the word "and" in the Call Right Provision, and specifically, whether both events must occur before Appellees can exercise the Call Right, we apply our well-established principles of contract interpretation.  In construing a contract, our goal is to give effect to the intent of the parties.[9]  "Delaware adheres to the 'objective' theory of contracts, *i.e.* a contract's construction should be that which would be understood by an objective, reasonable third party."[10]  We will read the contract as a whole and "enforce the plain meaning of clear and unambiguous language."[11]

---

[6] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1204 (Del. 1993) (citing *Levinson v. First Delaware Ins. Co.*, 549 A.2d 296, 298 (Del. 1998) and *Rohner v. Niemann*, 380 A.2d 549 (Del. 1997)).

[7] *Id.*

[8] *Id.* (citing *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2nd Cir. 1988)).

[9] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014).

[10] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[11] *Manti Hldgs, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021).

7

In doing so, we endeavor "to give each provision and term effect" and not render any terms "meaningless or illusory."[12]

Moreover, "[i]n giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract."[13] Where language is unambiguous, we "will give effect to the plain meaning of the contract's terms and provisions."[14] "Language is ambiguous if it is susceptible to more than one reasonable interpretation."[15] "An interpretation is unreasonable if it 'produces an absurd result' or a result 'that no reasonable person would have accepted when entering the contract.'"[16] "The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous."[17] "The determination of ambiguity lies within the sole province of the court."[18]

---

[12] *Id.* (quoting *Osborn ex rel. Osborn*, 991 A.2d at 1159).

[13] *Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Co. LLC*, 166 A.3d 912, 913–14 (Del. 2017). *See also Lorillard Tobacco v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006) ("A court must accept and apply the plain meaning of an unambiguous term in the context of the contract language and circumstances, insofar as the parties themselves would have agreed *ex ante*."); ANTONIN SCALIA & BRYAN A. GARNER, *Reading Law: Interpretation of Legal Texts* 69 (2012) (observing that the ordinary-meaning canon, that "[w]ords are to be understood in their ordinary, everyday meanings—unless the context indicates that they bear a technical sense," "governs constitutions, statutes, rules, and private instruments"); *id.* at 70 (observing that most common English words have more than one ordinary meaning and stating that "[o]ne should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise").

[14] *Manti Hldgs, LLC*, 261 A.3d at 1208 (quoting *Osborn ex rel. Osborn*, 991 A.2d at 1159–60).

[15] *Id.*

[16] *Id.* (citing *Osborn ex rel. Osborn*, 991 A.2d at 1160).

[17] *Id.* (quoting *Osborn ex rel. Osborn*, 991 A.2d at 1159–60).

[18] *Osborn ex rel. Osborn*, 991 A.2d at 1160.

## B. An Overview of Interpreting "And"

Resolution of this dispute lies in the correct interpretation of "and" — one of the most common words in the English language. One should not be fooled by the size and ubiquity of the word.[19] The use of this seemingly simple word in legal drafting has long been the cause of extensive litigation and debate.[20] Yet, as illustrated below, the debate has not firmly established any clear rules for interpreting the word. Nevertheless, two avenues of interpretation — the "conjunctive or disjunctive" path and the "joint or several" path — have emerged from the, at times, lively debate.

### 1. Conjunctive or Disjunctive?

*First*, "and" may be interpreted conjunctively or disjunctively. Many legal authorities support Weinberg's suggestion that ordinarily "and" is conjunctive, while "or" is disjunctive, and that courts will construe each word accordingly, absent strong reasons to break from the general rule.[21] When courts depart from the ordinary, conjunctive

---

[19] *See, e.g.*, *United States v. Haynes*, 55 F.4th 1075, 1078 (6th Cir. 2022) ("It turns out that 'and' has more meanings than one might suppose.").

[20] *See e.g.*, BRYAN A. GARNER, *Garner's Dictionary of Legal Usage* 639 (3d ed. 2011) ("[I]n the main text of *Words and Phrases* (2010) . . . the word *and* takes up 71 pages of digested cases interpreting it in myriad ways . . . .").

[21] *See e.g.*, *Silverman v. Silverman*, 206 A.3d 825, 832 n.35 (Del. 2019) ("When construing a statute, 'and' is presumed to be conjunctive—especially when 'or' is used in the same section disjunctively."); *Williams v. State*, 818 A.2d 906, 912 (Del. 2002) ("In its commonly accepted meaning '"and" is a connective, and is not generally used to express an alternative—unless it is followed by words which clearly indicate that intent.'" (citing *Klosowski*, 310 A.2d at 657)), *superseded by statute*, 74 Del. Laws ch. 246, §§ 2, 3 (2004) (codified at 11 *Del. C.* § 636(a)); *Concord Steel*, 2008 WL 902406, at *7 ("Usually, one would interpret 'and' only in the conjunctive, joining two or more elements in a list and requiring all of those elements . . . .") (footnote omitted); *United States v. Pulsifer*, 39 F.4th 1018, 1021 (8th Cir. 2022) ("Although ['and'] is sometimes 'ill chosen' and means 'or' when considered in context, *see United States v. Fisk*, 70 U.S. 445, 447, 3 Wall. 445, 18 L.Ed. 243 (1865), we typically would not construe a statute

meaning of "and," and construe it, instead, as a disjunctive "or," it is often because they acknowledge that sloppy drafting sometimes confuses the two.[22]  Accordingly, courts interpret "and" in the disjunctive sense to prevent an absurd or unreasonable result, or to give effect to the parties' intent and reasonable expectations.  In these cases, courts discern the meaning of the word from the context of the provision and the contract as a whole.  In short, although "and" typically bears a conjunctive meaning, that presumption can be overcome by context.

2. *Joint or Several?*

*Second*, "and" may be used in the joint or several sense.[23]  Like the Court of

---

to carry that nonliteral meaning unless there were clear indications in the statute that dictate that result.") (citing 1A NORMAN J. SINGER & J.D. SHAMBIE SINGER, *Sutherland Statutes and Statutory Construction* § 21.14 (7th ed. 2021))), *cert. granted*, 2023 WL 2227657 (U.S. Feb. 27, 2023); *OfficeMax, Inc. v. United States*, 428 F.3d 583, 589 (6th Cir. 2005) ("'[A]nd' presumptively should be read in its 'ordinary' conjunctive sense unless the 'context' in which the term is used or 'other provisions of the statute' dictate a contrary interpretation.") (citing *Crooks v. Harrelson*, 282 U.S. 55, 58 (1930))), *reh'g and reh'g en banc denied*, No. 04-4009, 2006 U.S. App. LEXIS 8294 (6th Cir. Mar. 30, 2006); 11 Williston on Contracts § 30:12 (4th ed.) ("It has been said that the words 'and' and 'or' should not be considered interchangeable in construing a contract, absent strong supporting reasons."); SCALIA & GARNER, *supra* note 13, at 116 (explaining that "[a]nd joins a conjunctive list, *or* a disjunctive list—but with negatives, plurals, and various specific wordings there are nuances").

[22] GARNER, *supra* note 20, at 56 ("Sloppy drafting sometimes leads courts to recognize that *and* in a given context means *or*, much to the chagrin of some judges—e.g.: 'We give our language, and our language-dependent legal system, a body blow when we hold that it is reasonable to read '*or*' for '*and*.'") (quoting *MacDonald v. Pan Am. World Airways, Inc.*, 859 F.2d 742, 746 (9th Cir. 1988) (Kozinski, J., dissenting))); SCALIA & GARNER, *supra* note 13, at 116 ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives.  Competent users of the language rarely hesitate over their meaning."); 17A C.J.S. Contracts § 428; 11 Williston on Contracts § 30:12 (4th ed.).

[23] GARNER, *supra* note 20, at 639 ("Authorities agree that *and* has a distributive (or several) sense as well as a joint sense.").  Weinberg claims that the trial court erred in relying on the second edition of Garner's book, *A Dictionary of Modern Legal Usage*, because Garner's view has since expanded, as iterated in the third edition.  Reply Br. at 11.  However, Garner reiterates his position

10

Chancery, we view this as the dispositive question before us.[24]  Some legal scholars

maintain that "[t]he meaning of *and* is usually *several*."[25]  The several "and" denotes A and

B, jointly or severally.  The joint "and" denotes A and B, jointly but not severally.[26]  For

example, when we say:  "the law punishes assault and battery," we mean a person will be

punished for committing the two crimes either when both crimes are committed together

(jointly) or separately (severally).  However, when we say:  "the law punishes drinking and

driving," we mean that the law punishes the two activities together (jointly), but not

separately (severally).

The determination between joint and several is distinct from the determination

between conjunctive and disjunctive.  As Judge John Rogers explained in his dissent in

*OfficeMax, Inc. v. United States*:

> In each sentence the word "and" has the same *conjunctive* meaning — the
> difference lies in whether the preceding words are distributed over the
> conjoined elements or not.  Whether to interpret the preceding words as
> distributed over the conjoined elements or not depends on the context of the
> sentence, and what we externally know about the conjoined elements.[27]

---

in the third edition, the one published in 2011 and cited by this opinion.  There, he restates that "the meaning of 'and' is usually several."  GARNER, *supra* note 20, at 639.

[24] *Chancery Opinion*, 2022 WL 2452141, at *1 ("[W]as 'and' intended in its several, or its joint, sense?  This is the sole issue necessary to resolution of the matter at hand, and the parties have made cross-motions for judgment on the pleadings.").

[25] *See, e.g.*, GARNER, *supra* note 20, at 639 (quoting SCOTT J. BURNHAM, *The Contract Drafting Guidebook* 163 (1992)); *Mason v. Range Res.-Appalachia LLC*, 120 F. Supp. 3d 425, 445 (W.D. Pa. 2015); F. Reed Dickerson, *The Difficult Choice Between "And" and "Or*," 46 A.B.A. J. 310, 311 (1960) ("Observation of legal usage suggests that in most cases 'or' is used in the inclusive rather than the exclusive sense, while 'and' is used in the several rather than the joint sense.").

[26] GARNER, *supra* note 20, at 639; Dickerson, *supra* note 25, at 310.

[27] 428 F.3d at 600 (Rogers, J., dissenting) (emphasis in original).  In our example above, the difference is whether the preceding words, "the law punishes" are distributed over the conjoined elements or not.  Judge Rogers presents another illustration.  He creates a scene of two guests at

11

The phrase preceding the two elements in the Call Right Provision, "[t]ermination . . . for any reason" and "a Restrictive Covenant Breach," is "during the six (6) month period following." If one distributed this preceding phrase across each element, the Call Right Provision would read, in relevant part:

> The Converted Units shall be subject to the right of repurchase (the "Call Right") exercisable by Parent, a member of the Sponsor Group, or one of their respective Affiliates, as determined by Parent in its sole discretion, *during the six (6) month period following* (x) the (i) the Termination of [Weinberg's] employment with the Service Recipient for any reason (or, if later, the six (6) month anniversary of the date of the exercise of the Options in respect of which the Option Stock was issued, *and during the six (6) month period following* (y) a Restrictive Covenant Breach.

In both the Call Right Provision as written and the distributive interpretation above, the "and" remains conjunctive. Accordingly, when confronting whether "and" is several or joint, we will look to "the context of the sentence, and what we externally know about the conjoined elements."[28]

### 3. Illustrating the "And" versus "Or" Debate

Courts have struggled with both the conjunctive or disjunctive determination and the joint or several determination, often conflating the two issues.[29] The Vice Chancellor

---

an event asking their host for a drink. One says, "I like bourbon and water," while the other says, "I like beer and wine." The second guest is disgusted when the host brings a glass of beer mixed with wine. This is because, although "and" is being used conjunctively in both phrases, common sense and context dictate that "I like beer and wine" means "I like beer and I like wine," and not, "I like beer and wine, together." In other words, the phrase "I like" is distributed over both items, beer and wine, whereas the phrase is not distributed in the phrase "I like bourbon and water." *Id*.

[28] *Id.*

[29] As we discuss below, Weinberg seems to conflate the two as well. Most of her arguments focus on convincing us that "and" is used in its ordinary, conjunctive sense in the Call Right Provision.

used an example from Professor Reed Dickerson who explained that a writer intending "that the person covered by [a] statute [governing donations] is to be free to have either, neither, or both, [] may use any of these three sentences to express the idea":

(A)   'He may contribute to charitable or educational institutions.'

(B)   'He may contribute to charitable institutions and educational institutions.'  Here, 'and' is several, not joint.

(C)   'He may contribute to charitable institutions or educational institutions.'  Here, 'or' is inclusive, not exclusive.[30]

Of the three options, Professor Dickerson recommended option (B) — using the "several" meaning of "and."  He noted that the only difference between sentences (B) and (C) is that one uses "and" and the other uses "or," illustrating that "'and' and 'or' produce the same result in such a context."[31]  Professor Dickerson noted that the several "and" and the inclusive "or" are interchangeable, but "this does not [mean] that 'and' means 'or,'" but rather, that "in such a context the two words are reciprocally related in that the implied meaning of one is the same as the expressed meaning of the other."[32]

Perhaps the best illustration of this debate is the federal circuit split that has developed recently regarding the interpretation of "and" in a federal criminal statute

---

In other words, that "and" does not mean "or."  This is unhelpful to Weinberg's cause not only because her arguments implicate an issue separate from the joint versus several issue, but also because the trial court expressly stated that "and" does not mean "or," "but rather, that 'in such a context the two words are reciprocally related in that the implied meaning of one is the same as the expressed meaning of the other.'"  *Chancery Opinion*, 2022 WL 2452141 at *4 (citing Dickerson, *supra* note 25, at 313).

[30] *Id.* (quoting Dickerson, *supra* note 25, at 313).

[31] *Id.* (quoting Dickerson, *supra* note 25, at 313).

[32] *Id.* (quoting Dickerson, *supra* note 25, at 313).

(known as the First Step Act).[33]  Both sides in this case have relied upon at least one of

these federal appellate decisions in support of their interpretation of "and."

Part of the First Step Act, set forth in 18 U.S.C. § 3553(f), and known as the Safety

Valve Provision, empowers a court to grant a criminal defendant relief from a mandatory

minimum sentence.[34]  18 U.S.C. § 3553(f) provides a sentencing safety valve to criminal

defendants, allowing courts to disregard the statutory minimum sentence if:

> (1) the defendant does not have —
>
>> (A) more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines;
>>
>> (B) a prior 3-point offense, as determined under the sentencing guidelines; ***and***
>>
>> (C) a prior 2-point violent offense, as determined under the sentencing guidelines.[35]

The Safety Valve Provision's use of "and" before prong (C) prompts the question of

whether a defendant is ineligible for relief if he has any of the three subsections (the

government's view)[36] or a defendant is ineligible only if he has all three subsections (the

defendant's view).[37]  Put another way, "[t]he question presented is whether — as the

---

[33] *See* First Step Act of 2018, Pub. L. No. 115–391, 132 Stat. 5194, 5221 (codified as amended in scattered sections of 18, 21, and 34 U.S.C.).

[34] 18 U.S.C. § 3553(f).

[35] 18 U.S.C. § 3553(f)(1) (emphasis added).  Additional criteria to qualify for safety valve relief are laid out in § 3553(f)(2)–(5).  For simplicity, this decision refers to (f)(1) as the "Safety Valve Provision."

[36] This interpretation results from a several, distributive "and."  In other words, to qualify for relief, the criminal defendant cannot have (A), cannot have (B), and cannot have (C).

[37] This interpretation results from a joint "and."  Criminal defendants could have (A), or (B), or (C), and qualify for relief, so long as they did not have (A), (B), and (C).

14

government argues . . . — this provision requires the defendant to show that he has *none* of the criminal history described in subsections (A)–(C); or whether instead — as [the defendant] argues — the defendant must show only that he lacks the criminal history described in *any one* of [the] subsections."[38]

At least seven federal circuit courts of appeal have addressed the "and" in the Safety Valve Provision in the last two years. Three have concluded that the "and" is several, or distributive, meaning that a criminal defendant must not have any of (A), or (B), or (C), to obtain relief under the statute. One reached the same conclusion about the meaning of the statute but reasoned that the "and" was disjunctive. And three found the opposite: that, so long as a criminal defendant did not have all three, (A), (B), and (C), the defendant was eligible for relief under the statute.

### a. The Ninth Circuit

The Ninth Circuit was the first to confront the issue, in *United States v. Lopez*, a case cited by Weinberg. That court asked whether the Safety Valve Provision's "and" is conjunctive or disjunctive.[39] After "[a]pplying the tools of statutory construction," it held that "[the Safety Valve Provision's] 'and' is unambiguously conjunctive."[40] "Put another

---

[38] *Haynes*, 55 F.4th at 1078 (emphasis in original).

[39] 998 F.3d 431, 435 (9th Cir. 2021), *reh'g en banc denied*, 58 F.4th 1108 (9th Cir. 2023). In his statement regarding denial of *rehearing en banc*, Judge Nelson called for the United States Supreme Court to review the issue given "[t]he present degree of circuit court confusion," and he noted that "[s]eventeen judges in six circuits have now offered their unique take on this same question." *Lopez*, 58 F.4th at 1108.

[40] *Lopez*, 998 F.3d at 433.

way, [it held] that 'and' means 'and.'"[41] The *Lopez* court began its analysis by emphasizing, that "the government concedes that the plain and ordinary meaning of [the Safety Valve Provision's] 'and' is conjunctive," a proposition with which the court agreed.[42] Although it acknowledged that where context requires, a court may give disjunctive effect to "and," it held that the context of the Safety Valve Provision did not call for a disjunctive reading.[43] Therefore, the "and" was unambiguously conjunctive, meaning "[a] defendant must have all three [(A), (B), and (C)] before [the Safety Valve Provision] bars him or her from safety-valve relief."[44]

### b. The Eighth Circuit

Over a year later, the Eighth Circuit decided *United States v. Pulsifer*,[45] a case relied upon by Appellees here. The court acknowledged that "[t]he most natural reading of 'and' is conjunctive" and that it should be construed as such absent "clear indications in the

---

[41] *Id.*

[42] *Id.* at 436.

[43] *Id.* at 438 (observing that construing "and" in the Safety Valve Provision conjunctively "neither produces absurd results nor renders other statutory terms superfluous"). Moreover, the court held that the structure of the statute as a "conjunctive negative proof" was "determinative" of the issue. *Id.* at 437.

[44] *Id.*; *id.* at 444 ("Section 3553(f)(1)'s plain and unambiguous language, the Senate's own legislative drafting manual, § 3553(f)(1)'s structure as a conjunctive negative proof, and the canon of consistent usage result in only one plausible reading of § 3553(f)(1)'s 'and' here: 'And' is conjunctive."). The court disagreed with the government's argument that defendant's interpretation would render (A) surplusage, because someone with (B) a prior three-point offense and (C) a prior two-point violent offense will always have (A) more than four criminal history points. *Id.* at 440. Moreover, the court stated that even if the plain, conjunctive meaning of "and" produced surplusage, its "holding would not change" because "[t]he canon against surplusage is just a rule of thumb." *Id.* at 441.

[45] 39 F.4th 1018 (8th Cir. 2022), *cert. granted*, 2023 WL 2227657 (U.S. Feb. 27, 2023).

16

statute that dictate" it means "or."[46]  But it framed the issue differently, using the distributive/several framework:

> The parties discuss whether "and" should be read conjunctively or disjunctively, but we do not believe that is the important question. . . . The important question here is in what sense the statute uses the word "and" in the conjunctive. When used as a conjunctive, the word "and" has "a distributive (or several) sense as well as a joint sense."[47]

The court then concluded that the "better reading of the statute" was that the "and" in the Safety Valve Provision was distributive (or several).[48]  In other words, "[t]he text distributes the introductory phrase 'does not have' across each statutory condition."[49]  The court pointed to a "strong textual basis to prefer a distributive reading of 'and,'"[50] namely, that prong (A) would be rendered surplusage if "and" were read jointly.[51]  In other words, the defendant fails to qualify for the "safety valve" if he has any of (A), (B), or (C).

---

[46] *Id.* at 1021.

[47] *Id.* (quoting GARNER, *supra* note 20, at 639).

[48] *Id.* at 1022.  In refusing to apply the rule of lenity, the court noted that "traditional tools of interpretation reveal the meaning of the provision, and there is no grievous ambiguity."  *Id.* at 1023.

[49] *Id*. at 1022.

[50] *Id*. at 1021.

[51] *Id.*  Specifically, the court said:

> There is a strong textual basis to prefer a distributive reading of "and" in § 3553(f). If "and" is read jointly, then subsection (A) is rendered superfluous.  A defendant who has a prior three-point offense under subjection (B) and a prior two-point violent offense under subjection (C) would *always* meet the criterion in subsection (A), because he would always have more than four criminal history points.  Thus, reading "and" in its joint sense would leave subsection (A) without any independent operation.

This is the argument that the Ninth Circuit rejected in *Lopez*.

17

Although the defendant did not have a two-point violent offense, he had a four-point offense and a three-point offense, and, thus, he was not eligible.[52]

### c. *The Seventh Circuit*

Then, two months after *Pulsifer*, the Seventh Circuit threw its hat in the ring in *United States v. Pace*.[53] The *Pace* court is an outlier: It held that "[a]lthough Mr. Pace is correct that the word 'and' is commonly utilized conjunctively and is used in that way in other parts of § 3553(f), the context of the word 'and' in [the Safety Valve Provision] supports the view that it should be read *disjunctively*."[54] The court reasoned that a conjunctive interpretation "cannot be squared with the canon against surplusage."[55] Moreover, it found that "[t]he use of the em-dash following subsection one . . . to connect the subsections demonstrates that the lead-in 'does not have' modifies each subsection requirement."[56] Finally, the circuit court concluded that a conjunctive interpretation would "produce[] absurd results."[57] And the rule of lenity did not apply because the statute was not ambiguous.

---

[52] *Id.* at 1022–23.

[53] *United States v. Pace*, 48 F.4th 741 (7th Cir.), *reh'g en banc denied*, 2022 WL 17254332 (7th Cir. 2022), *petition for cert. docketed*, No. 22-828 (U.S. Mar. 1, 2023).

[54] *Id.* at 754 (emphasis added).

[55] *Id.* ("By contrast, the 'disjunctive' interpretation gives independent meaning to all three subsections; it does not render subparagraph (A) meaningless.").

[56] *Id.* The Seventh Circuit acknowledged this was the "distributive" approach taken by the Eighth Circuit in *Pulsifer*. *Id.* It described the Eighth Circuit's approach as "conceptually quite compatible with [the Seventh Circuit's] emphasis on the em-dash," and remarked that "the most important textual basis for this 'distributive' reading is Congress's use of the em-dash." *Id*.

[57] *Id.* at 755.

The Seventh Circuit is the only federal appellate court to ultimately conclude that to be eligible for relief, a criminal defendant must demonstrate that he does not have any of the criminal history criteria described in the Safety Valve Provision, because the meaning of "and" is disjunctive. This reasoning drew a concurring opinion from Judge Kirsch, who agreed with the Eighth Circuit that the "and" was conjunctive, several, and distributive.[58]

### d. The Fifth Circuit

Writing two months after *Pace*, the Fifth Circuit next weighed in. In *United States v. Palomares*, it stated: "We agree with the Eighth Circuit that Congress's use of an em-dash following 'does not have' is best interpreted to 'distribute' that phrase to each following subsection."[59] Like the Eighth Circuit, it acknowledged that although "[t]he ordinary meaning of 'and,' which [the Safety Valve Provision] uses to join the three subsections, is conjunctive,"[60] "when used as a conjunctive, the word 'and' has 'a

---

[58] *Id.* at 756–59 (Kirsch, J., concurring). It also prompted a dissent.

[59] 52 F.4th 640, 642 (5th Cir. 2022), *petition for cert. docketed*, No. 22-6391 (U.S. Dec. 23, 2022). The Fifth Circuit observed that the structure of the statute "understandably read as an eligibility checklist of conditions that the defendant cannot possess to be eligible for safety valve relief." *Id.* at 647. It used the following analogy: Suppose a person was about to enter a baseball stadium and saw a sign that read:

> To enter the stadium, you must not have —
> > (a) a weapon;
> > (b) any food; and
> > (c) any drink.

Readers would understand that "must not have —" independently modifies (and is distributed over) each item. Thus, no baseball fan would insist that she could enter the stadium with a weapon just because she did not have food or a drink. *Id.* at 644.

[60] *Id.* at 643 (citing SCALIA & GARNER, *supra* note 13, at 116–25).

distributive (or several) sense as well as a joint sense."[61]  "To determine whether 'and' is used in a 'joint' sense or a 'distributive' sense in [the Safety Valve Provision], we must look to the context of the statute itself."[62]

Looking to the context, the court confirmed "the 'distributive approach' is the most natural and indeed the most likely intent behind Congress' choice of a unique structure for [the Safety Valve Provision]."[63]  It concluded that "the distributive meaning of 'and' . . . is the preferred interpretation because it avoids violating the canon against surplusage,"[64] whereas "[t]he alternative readings are implausible because they each fail to account for the plain meaning of the statute in some way."[65]  Accordingly, the defendant could not have any of the criminal history described in subsections (A)–(C) to qualify for relief.

### e.  The Sixth Circuit

The Sixth Circuit then addressed the issue in *United States v. Haynes*, and it agreed with the Eighth and Fifth Circuits.[66]  It held that the "and" in the Safety Valve Provision was conjunctive, in accordance with its ordinary meaning, and several, as confirmed by the statutory context.  The *Haynes* court primarily relied on two reasons to support its reading

---

[61] *Id.* (citing GARNER, *supra* note 20, at 639).

[62] *Id.*

[63] *Id.* at 647.  The court focused, in part, on the structure of (f)(1), particularly on the presence of a negative preceding an em-dash followed by a conjunctive list, as supporting the distributive interpretation of "and." *See supra* note 59.

[64] *Id.* at 644.

[65] *Id.* at 647.

[66] 55 F.4th 1075.  It too viewed the question before it as "which sense of 'and' — distributive or joint — is used in § 3553(f)(1)(B)," and took as a given that "and" was conjunctive. *Id.* at 1078.

of the Safety Valve Provision. First, the content of the government's proposed reading (that "and" is several) is "logically coherent" and "more plausible" because each of the conditions, (A)–(C), "is quite plausibly an independent ground to deny a defendant the extraordinary relief afforded by the safety valve."[67] Second, the distributive "and" is the only interpretation that abides by the "cardinal principle" of statutory construction to avoid surplusage.[68] The Sixth Circuit affirmed the district court's judgment that the defendant, Haynes, was ineligible for safety valve relief because he had a prior conviction for which he was assigned three points under the Sentencing Guidelines.

### f. The Fourth Circuit

Most recently, the Fourth Circuit Court of Appeals voiced its opinion on the matter in *United States v. Jones*.[69] It concluded "the [g]overnment's argument is nothing more than an exaggerated way of saying 'and' means 'or,' an interpretation we must reject."[70] It was compelled to reject the government's argument because the Safety Valve Provision's "plain language is unambiguous."[71] "And" means "along with or together with," requiring

---

[67] *Id.* at 1079. The court noted the arbitrariness of defendant's reading which would allow relief for "an incorrigible recidivist" with 24 criminal history points but who lacked a prior two-point violent offense. Similarly, it would allow relief for a defendant with 25 criminal history points generated in part by six convictions for assault with a deadly weapon and six convictions for domestic assault (both of which can be two-point violent offenses), but who, by fortuity, lacked a prior three-point offense. *Id.* at 1080.

[68] *Id.* at 1080. For example, under the defendant's interpretation, a defendant with "a prior 2-point violent offense and a prior 3-point offense by definition would have more than 4 criminal history points" rendering subsection (A) without "any practical effect." *Id.*

[69] 2023 WL 2125134 (4th Cir. Feb. 21, 2023).

[70] *Id.* at *2.

[71] *Id.*

all of the conditions in a list, and such meaning "does not change simply because it is preceded by a negative marker."[72]  It found this ordinary meaning was buttressed by the canon of consistent usage.

### g. *The Eleventh Circuit*

The Eleventh Circuit presents a microcosm of the debate all by itself.  Writing a few weeks before *Haynes*, an *en banc* panel of the Eleventh Circuit reached the opposite conclusion as the Fifth, Sixth, Seventh, and Eighth Circuits, in *United States v. Garcon*.[73] In doing so, it reversed a unanimous three-judge panel, which had itself vacated the judgment of the district court.[74]  The district court had held that "and" in the Safety Valve Provision was conjunctive such that Garcon, the criminal defendant, needed to have all three prongs before he is ineligible for relief.  The three-judge panel of the Eleventh Circuit vacated and reversed the district court, holding that, although "'and' is presumed to have its ordinary, conjunctive meaning unless the context dictates otherwise," "and," as used here, was disjunctive.[75]  It reasoned that if "and" were read conjunctively, subsection (A) would be superfluous.

However, the Eleventh Circuit *en banc* panel agreed with the district court and interpreted "and" in accordance with its ordinary conjunctive meaning, a meaning which

---

[72] *Id.*

[73] 54 F.4th 1274 (*Garcon III*) (11th Cir. 2022) (en banc), *petition for cert. docketed*, No. 22-851 (U.S. Mar. 8. 2023).

[74] *United States v. Garcon* (*Garcon II*), 997 F.3d 1301 (11th Cir. 2021), *rev'd en banc*, *Garcon III*, 54 F.4th 1274.

[75] *Id.* at 1305–06.

22

it held was retained "when a list of requirements follows a negative."[76]  Relying in part on the ordinary-meaning canon of construction, the court found that the statutory context confirmed its reading of "and."[77]  And, importantly, the *en banc* panel found that the ordinary meaning of "and" did not produce a surplusage.[78]  In doing so, the court expressly rejected the distributive, or several, interpretation of "and" advocated for by the government-appellee and accepted by the Fifth, Sixth, and Eighth Circuits.[79]  Reframing the issue, it stated:

> Essentially, the government invites us to read "and" to mean "or," even as it concedes elsewhere in its briefs that this reading is mistaken.  Neither the government nor our dissenting colleagues offer any authority that adopts this novel reading of "and," other than recent decisions by our sister circuits that concern the same statutory provision. . . .  The government is asking us to inject the words "does not have" into the statute where they do not appear.[80]

Accordingly, the *en banc* panel rejected the government's arguments that to construe "and" in the joint sense would produce surplusage, an absurd result, and be contrary to legislative intent.  Four judges dissented, three of whom wrote separately, and two judges concurred.[81]

---

[76] *Garcon III*, 54 F.4th at 1278 (citing SCALIA & GARNER, *supra* note 13, at 119).

[77] *Id.* ("Context confirms this reading.  Ordinarily, we presume that 'identical words used in different parts of the same act are intended to have the same meaning.'") (citing *Util. Air Regul. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 319 (2014))).  It noted that "and" was used conjunctively elsewhere in the statute, and "or" was used disjunctively.  *Id.* at 1278–79.

[78] *Id.* at 1281–83.

[79] *Id.* at 1280.

[80] *Id.*

[81] Concurring Judge Rosenbaum, referring to the "shootout at the Eleventh Circuit Corral," joined the majority but said that "the traditional tools of statutory interpretation fail to produce one interpretation of [the Safety Valve Provision] that is 'the best interpretation'," and described the statute as having a "grievous ambiguity."  *Id.* at 1285–86 (Rosenbaum, J., concurring).  He would

In explaining their differing views on the interpretation of "and," the federal circuit courts also divided on the canon of surplusage, with a majority (four) of the federal circuit courts holding that the joint construction of "and" would impermissibly render subsection (A) surplusage, and the remaining (three) circuit courts reaching the opposite conclusion. As the "Safety Valve" example illustrates, there is room for disagreement even among appellate panels when interpreting the word "and," and even where the context remains constant.

*C. The Trial Court's Decision*

We acknowledge that the Safety Valve statute's text, structure, and context is different from the text before us and, thus, the ultimate resolution by the United States Supreme Court, which has granted *certiorari*, will not bear on this case.[82] However, the foregoing discussion of the federal courts' epic battle over "and" illustrates the range of possible interpretations our federal appellate sister courts have endorsed in construing "and." Notably, the conjunctive/several interpretation is not, as Appellants vehemently suggest, a mere aberrational academic construct invented by a law professor that is unsupported by case law. These opinions also illustrate that the language in the statute can be unambiguous, notwithstanding a plethora of conflicting views among panels of judges

have applied the rule of lenity to settle the ambiguity. *Id.* at 1286. The dissenters argued that the majority adhered too rigidly to the ordinary-meaning and consistent usage cannons at the expense of the "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Id.* at 1300 (Branch, J., dissenting).

[82] The United States Supreme Court has granted certiorari in *United States v. Pulsifer*. *See United State v. Pulsifer*, 2023 WL 2227657 (U.S. Feb. 27, 2023).

and even among the circuit courts of appeal. As this Court recently reaffirmed, "[t]he parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous."[83]

In this case, the Court of Chancery found that the "and" in each of the Option Agreements was unambiguous for two reasons. *First*, it found that "the plain language of the Call Right provision supports [Appellees]' interpretation because it is consistent with the 'several' use of 'and' that is used in permissive sentences" and because it "aligns with the colloquial understanding of English as commonly used."[84] The court's holding did not depend on whether "and" was conjunctive or disjunctive. Rather, the Court of Chancery adopted Professor Reed Dickerson's suggestion that whether "and" is several or joint depends in part on whether it is used in a permissive or mandatory sentence.

Because the Call Right Provision gave Appellees the broad right to repurchase Weinberg's Converted Units, exercisable at Derby LP's sole discretion, the Court of Chancery found the Call Right Provision to be permissive. Accordingly, the "and" in the

---

[83] *Manti Holdings, LLC*, 261 A.3d at 1208; *see also Cox Comm., Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022) ("Critically, a contractual provision is 'not rendered ambiguous simply because the parties in litigation differ' as to the proper interpretation.") (citing *City Investing Co. Liquidating Trust v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993))). However, as the dissent in *Cox* observed, although "[t]his is a well-established proposition," authority does exist to support the proposition that "[d]ifferences among panel members" as to the meaning of a contractual provision, while not creating ambiguity "automatically," may suggest that more than one reasonable interpretation exists, *i.e.,* the provision is ambiguous. *Id.* at 771–72 (Valihura, J., concurring in part, dissenting in part) (collecting cases). The author of this opinion humbly acknowledges that her view in *Cox* (that the contract at issue was ambiguous, as evidenced in part, by the conflicting views among the Justices and Vice Chancellor), did not carry the day.

[84] *Chancery Opinion*, 2022 WL 2452141 at *4; *accord id.* at *1 ("Here, the use of 'and' is permissive and several; it describes a pair of periods when a call right may be exercised.").

Call Right Provision was several, in accordance with its ordinary meaning.[85] The trial court noted that this does not mean "and" means "or," rather, it means that "in such a context the two words are reciprocally related in that the implied meaning of one is the same as the expressed meaning of the other."[86]

*Second*, the Court of Chancery found that Appellees' interpretation of the Call Right is the only interpretation that gives effect to all terms in the Second and Third Option Agreements. Specifically, the court found that Weinberg's interpretation would render another provision, which determines the price which Appellees will pay to repurchase Weinberg's Converted Units, surplusage. Accordingly, the Court of Chancery held that the Call Right Provision is exercisable upon satisfaction of one of the conditions, and that both a termination for any reason and a Restrictive Covenant Breach are not required. Because Waystar exercised its Call Right on November 21, within six months of the date Weinberg was terminated, the exercise was timely and valid.

## D. The Plain Language and Context Confirm the Court of Chancery's Interpretation

Weinberg challenges the trial court's reliance on Professor Dickerson's permissive versus mandatory principle, and she argues, in the alternative, that the Call Right Provision is mandatory, not permissive. Although, like the Vice Chancellor, we view the provision

---

[85] *Id.* at *4; *see also* GARNER, *supra* note 20, at 639; *Mason*, 120 F. Supp.3d at 445–46 ("When the word 'and' is used in a permissive sentence, it is likely to be used in its several sense.") (citing Maurice B. Kirk, *Legal Drafting: The Ambiguity of "And" and "Or,"* 2 Tex. Tech. L. Rev. 235, 243 (1971)); Dickerson, *supra* note 25, at 312.

[86] *Chancery Opinion*, 2022 WL 2452141 at *4 (citing Dickerson, *supra* note 25, at 313).

as permissive,[87] we conclude that the Court of Chancery's second reason for concluding the "and" in the Call Right Provision is several and distributive is a sufficient and compelling reason to reject the merits of Weinberg's appeal. That is, the Court of Chancery's interpretation of the Call Right is the only interpretation that gives effect to all provisions of the Option Agreements.[88] The plain language of each of the Option Agreements, read as a whole, and taking account of the overall context, evinces the parties' unambiguous intent to grant Appellees a Call Right exercisable after Weinberg's termination, with or without a Restrictive Covenant Breach.

1. *"[I]f later, the six (6) month anniversary of the date of the exercise of the Options . . ."*

*First*, the Call Right Provision not only specifies under which conditions the Call Right may be exercised, but it also specifies its temporal limits. It provides that the Call Right is exercisable during the six-month period following Weinberg's termination for any

---

[87] The Call Right Provision grants a Call Right "exercisable by Parent, a member of the Sponsor Group, or one of their respective Affiliates, as determined by Parent in its sole discretion." App. to Opening Br. at A56 (First Option Agreement § 10(a), at 5), A68 (Second Option Agreement § 10(a), at 6), A86 (Third Option Agreement § 10(b), at 6). Weinberg argues that the Parent's "sole discretion" afforded by the provision is to determine which entity, out of "Parent, a member of the Sponsor Group, or one of their respective Affiliates," would exercise the Call Right, once triggered. Therefore, she argues, the "sole discretion" language does not support a reading that the provision is permissive. Opening Br. at 26. We disagree. The Call Right is a permissive right which Waystar has sole discretion to exercise upon the triggering of the right. We note that even Weinberg has acknowledged that Waystar "could [] determine, in its sole discretion, whether or not to repurchase the Converted Units" if the Converted Units become subject to the Call Right. *Id.* at 26–27.

[88] *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) ("The contract must also be read as a whole, giving meaning to each term and avoiding an interpretation that would render any term 'mere surplusage.'") (citing *Osborn ex rel. Osborn*, 991 A.2d at 1159–60)); *Manti Hldgs, LLC*, 261 A.3d at 1208.

27

reason "(or, if later, the six (6) month anniversary of the date of the exercise of the Options in respect of which the Option Stock was issued" and "a Restrictive Covenant Breach." The "if later" clause relates to Section 3 of each Option Agreement, which allows an award recipient 90 days after the date of their termination without cause, or their resignation, to exercise their vested and exercisable options.

But Section 3 of the Second and Third Option Agreements further provides that, immediately upon a Forfeiture Event, the award recipient "may not exercise any vested and exercisable Options" and "such vested Options shall immediately terminate and expire (without payment of any consideration therefor)."[89] In both agreements, a "Forfeiture Event" includes "the date of a Restrictive Covenant Breach."[90] This means that the date of exercise of an award recipient's vested and exercisable options can *never* be after the date of a Restrictive Covenant Breach. Under Weinberg's reading, Appellees may only exercise the Call Right if a Restrictive Covenant Breach has occurred, effectively depriving the "if later" clause in the Second and Third Option Agreements of meaning or application.[91]

---

[89] App. to Opening Br. at A66–67 (Second Option Agreement § 3(b)(iv), at 4–5), A84 (Third Option Agreement § 3(b)(iv), at 4).

[90] *Id.* at A64 (Second Option Agreement § 2(c)(iv), at 2), A82 (Third Option Agreement § 2 (c)(iii), at 2).

[91] Further, Weinberg's interpretation requires the Court to read into the provision that the six-month period starts running on "the later of two dates," *i.e.*, the termination date and the Restrictive Covenant Breach date. Reply Br. at 21. However, the First Option Agreement uses "if later" or the "earlier of" when it wants to use a later or earlier event as a benchmark. It states in the Call Right Provision itself that the Call Right is exercisable during the six-month period following the employee's termination, "or, if later, the six (6) month anniversary of the date of the exercise of the Substitute Options." App. to Opening Br. at A56 (First Option Agreement § 10(a), at 5). It also states that the Call Right "shall expire on the earlier of (i) an Initial Public Offering or (ii) a Change of Control." *Id.* Another example is Section 9 of the First Option Agreement which provides that under certain circumstances, "the Company may . . . extend the post-termination

28

## 2. *The Two-Tiered Repurchase Price Provision*

*Second*, we agree with the Court of Chancery that Weinberg's reading of the Call Right would render another provision in the Second and Third Option Agreements, a two-tiered repurchase price provision (the "Repurchase Price Provision"), surplusage.[92] Although all three Option Agreements have identical Call Right Provisions, the Second Option Agreement and the Third Option Agreement contain the Repurchase Price Provision, which the First Option Agreement lacks.[93]

The Repurchase Price Provision, in Paragraph 10(b) of the Second Option Agreement and Paragraph 10(c) of the Third Option Agreement, provides:

> In the event the Call Right is exercised, the purchase price for the Converted Units subject to the exercised Call Right shall be the Fair Market Value (as defined in the Partnership Agreement) per unit on the closing date of the repurchase; provided that in the case of a Forfeiture Event, the purchase price for the Converted Units subject to the exercised Call Right shall be the lesser of (x) the per unit price paid by the Participant for the Converted Units, as adjusted to reflect any dividends or distributions paid in respect of such units and (y) the Fair Market Value (as defined in the Partnership Agreement) per

exercise period . . . until the earlier of (x) . . . and (y) the Final Expiration Date." *Id.* (First Option Agreement § 9, at 5).

[92] *Chancery Opinion*, 2022 WL 2452141 at *5 ("This plain language reading of the Call Right provision is bolstered by a separate provision in the Second and Third Option Agreements that would be rendered meaningless if I were to adopt Weinberg's interpretation of the Call Right provision.").

[93] The First Option Agreement includes a repurchase price provision, in Paragraph 10(b), that is single tiered. It provides that the "purchase price for the Converted Units subject to the exercised Call Right shall be the Fair Market Value (as defined in the Partnership Agreement) per unit on the closing date of the repurchase." App. to Opening Br. at A56 (First Option Agreement § 10(b), at 5). It does not distinguish between a purchase price upon a "Forfeiture Event," and the term is not defined.

29

unit on the closing date of the repurchase.[94]

In other words, the Second and Third Option Agreements set two different prices at which Appellees may exercise their Call Right, depending on whether a "Forfeiture Event" has occurred. Both agreements define "Forfeiture Event" to include "the date of a Restrictive Covenant Breach":

> "Forfeiture Event" means (A) the date of the Participant's Termination for Cause (or voluntary resignation by the Participant at a time when the Board reasonably determines that the Employer could have terminated the Participant's employment for Cause) or (B) the date of a Restrictive Covenant Breach.[95]

Accordingly, if we were to read the Call Right Provision as Weinberg does, the first tier of the Repurchase Price Provision would be rendered meaningless and would never apply. This is because if both termination for any reason and a Restrictive Covenant Breach were required to trigger the Call Right, the repurchase of Converted Units would always be subject to the price reserved for Forfeiture Events.

The inclusion of the two tiered Repurchase Price Provision demonstrates that the drafters contemplated (and Weinberg reasonably should have understood) that the Call Right could be triggered absent a Forfeiture Event, *i.e.*, absent a Restrictive Covenant Breach. Otherwise, there would have been no need to provide a purchase price for that scenario.[96]

---

[94] *Id.* at A68 (Second Option Agreement § 10(b), at 6), A86 (Third Option Agreement § 10(c), at 6).

[95] *Id.* at A64 (Second Option Agreement § 2(c)(iv), at 2), A82 (Third Option Agreement § 2(c)(iii), at 2).

[96] Restatement (Second) of Contracts § 203 cmt. b ("Where an integrated agreement has been negotiated with care and in detail and has been expertly drafted for the particular transaction, an

30

On appeal, Weinberg points out that the First Option Agreement, which governs 89,318.96 of Weinberg's Converted Units (approximately 83% of the options), does not have the same Repurchase Price Provision. Instead, the First Option Agreement has a repurchase price provision with only one tier: It sets the repurchase price at "the Fair Market Value (as defined in the Partnership Agreement)[97] per unit on the closing date of the repurchase."[98] It does not differentiate between a price when the Call Right is triggered by a Forfeiture Event or absent a Forfeiture Event. She argues that it was error for the Court of Chancery not to analyze each Option Agreement independently, as separate, and independent contracts. Further, she contends that if the presence of the Repurchase Price Provision in the Second and Third Option Agreements requires us to affirm the Court of Chancery's ruling, then the absence of the Repurchase Price Provision in the First Option Agreement compels us to reverse its ruling as to those options.

We are not persuaded by Weinberg's arguments. All three Option Agreements are between the same parties, Appellees and Weinberg, and concern the same subject matter — the granting of options to purchase shares of Derby Inc. under the Plan. All three Option

---

interpretation is very strongly negated if it would render some provisions superfluous."). *Cf. Charney v. Am. Apparel, Inc.*, 2015 WL 5313769, at *15 (Del. Ch. Sept. 11, 2015) ("The canon against surplusage, moreover, is most properly used to fathom the objective intent of the contracting parties, not 'to trap a careless draftsperson into including a contract right that he did not mean to include. And [the canon] does not change the fact that courts will not bend contract language to read meaning into the words that the parties obviously did not intend.'") (quoting *Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 588 (Del. Ch. 2006))).

[97] All three Option Agreements define Fair Market Value by referring to the definition in the Derby LP Partnership Agreement.

[98] App. to Opening Br. at A56 (First Option Agreement § 10(b), at 5).

Agreements were executed within the same year, with the First Option Agreement and the Second Option Agreement executed within 24 hours of each other. The Call Right Provision is identical in all three Option Agreements and should be interpreted consistently. It would be illogical to conclude that the identical Call Right Provision in the First Option Agreement, signed the day before the Second Option Agreement, by the same parties, has a different and contradictory meaning than the one in the Second and Third Option Agreements. If the parties had intended for the Call Right Provisions to have different meanings, and conditions, it is reasonable to conclude that they would have changed the language in the Call Right Provision itself.

E. *The Several Reading of "And" Is the Only Reasonable Reading*

Further, although Weinberg sets forth arguments as to why "and" means "and," (in the conjunctive, joint sense) and why we should not rely on an article written 60 years ago by a law professor, she does not set forth any arguments as to why "and" should be interpreted jointly, rather than severally. This is problematic because, for one, interpreting "and" severally does not contradict Weinberg's proposition that "and" is conjunctive, or in other words, that "and" means "and."

Weinberg does not explain why the Court of Chancery's interpretation is tantamount to reading "and" as "or." As discussed above, the joint versus several determination is distinct from the conjunctive versus disjunctive determination. Moreover, there is another distinction that would come into play, even if we were to hold that "and" is disjunctive, *i.e.*, that "and" means "or," that is also separate from the conjunctive versus disjunctive determination. We would need to ask (as in the charitable/educational institution example

32

above) whether "or" was being used *inclusively* (A or B, or both) or *exclusively* (A or B, not both).[99]  As that example illustrated, the inclusive "or" may be used interchangeably with the several "and," but this does not mean that "and" means "or."  More importantly, the several use of "and" is the only reasonable reading of the Call Right Provision for the additional reasons set forth below which consider, more broadly, the context of the provision.

1.  *The Permissive Use of "And" Here Suggests Its "Several" Sense*

*First*, as a baseline, although some scholars maintain that "the meaning of *and* is usually *several*,"[100] it is, at least, commonplace.  This is especially true in permissive sentences[101] and aligns with our understanding of common, ordinary usage.  For example, if the litigants went to a breakfast meeting and the host said, "You may have a yogurt, a muffin, and a bagel," the litigants would understand that they may take any of the food items, all of the food items, or none of the food items.  In the same situation, albeit with a more demanding host, if the litigants were told, "You must take a yogurt, a muffin, and a bagel," they would understand that they must take all three food items.  The example is easily tweaked to demonstrate why Weinberg's suggestion, which is offered without

---

[99] *See e.g.*, GARNER, *supra* note 20, at 639 ("Authorities agree that . . . *or* has an inclusive sense as well as an exclusive sense"); *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015); Dickerson, *supra* note 25, at 310 ("[I]t is not always clear whether the writer intends the *inclusive* 'or' (A or B, or both) or the *exclusive* 'or' (A or B, but not both).")

[100] GARNER, *supra* note 20, at 639; *Mason*, 120 F. Supp. 3d at 445.

[101] *Chancery Opinion*, 2022 WL 2452141 at *4 (citing Dickerson, *supra* note 25, at 312); *Mason*, 120 F. Supp. 3d at 445 ("[W]hen the word 'and' is used in a permissive sentence, it is likely to be used in its several sense.") (citing Kirk, *supra* note 85, at 243)).

33

explanation, that the Court of Chancery's interpretation renders "and" to mean "or" is illogical. If our host told the litigants, "You may take a yogurt, a muffin, or a bagel," the question would be raised whether the litigants could take all three food items, or they were limited to one. In other words, a question would exist as to whether "or" was inclusive or exclusive. As our example illustrates, "and" does not mean "or."[102]

### 2. The Call Right is a Restriction on Weinberg's Rights

*Second*, the nature of a Call Right and the plain language of the Call Right Provision in each Option Agreement suggest that a reasonable third party would expect that Appellees retained a broad right to repurchase Weinberg's Converted Units. The phrasing of the provision, "[t]he Converted Units shall be subject to the right of repurchase," rather than being mandatory and obligating Appellees, is a statement *subjecting* Weinberg's Converted Units to Appellee's repurchase right, which they have "*sole discretion*" to exercise.[103]

### 3. The Joint Reading of "And" Produces an Illogical Result

*Third*, Weinberg's joint interpretation of "and" in the Call Right Provision would prevent Waystar from exercising its Call Right despite an employee's for-cause termination, other than one based upon a Restrictive Covenant Breach. For-cause

---

[102] Speaking of breakfast examples, in his dissent in *MacDonald v. Pan Am World Airways, Inc.*, Judge Kozinski observed that "[o]ne need only start the day with a breakfast of ham *or* eggs to be duly impressed by the difference." 859 F.2d at 746.

[103] Moreover, this interpretation aligns with the disclosure in the Partnership Agreement, (to which the First Option Agreement references and makes the Converted Units subject) that Weinberg's Converted Units "may be forfeited or fail to vest." App. to Opening Br. at A127 (Partnership Agreement § 6.2(d), at 23).

termination is defined in the Plan as including, for example, willful failure to substantially perform her duties and responsibilities, substantial negligence in the performance of her duties and responsibilities, and conviction of a felony.[104] Her reading is not logical. It is highly unlikely a company would structure its right to repurchase its equity in such a restrictive manner — depriving itself of the ability to repurchase equity from one who has willfully failed to perform, who has been substantially negligent, or who perhaps even has committed a felony, while inexplicably ordaining a Restrictive Covenant Breach with outsized importance by requiring a Restricted Covenant Breach to have occurred before the Call Right can be exercised.[105]

---

[104] *Id.* at A47 (App. A to the Plan, Definition of "Cause").

[105] Further, the Plan's text discourages actions giving rise to for-cause termination, not specifically Restrictive Covenant Breaches. For example, the Plan provides for different exercise schedules when an employee is terminated for-cause and when they are terminated without cause. Section 6(c)(iii) of the Plan provides:

> Unless otherwise provided by the Committee, whether in an Award Agreement or otherwise, in the event of: (A) a Participant's Termination by the Service Recipient for Cause, all outstanding Options granted to such Participant shall immediately terminate and expire; (B) a Participant's Termination due to death or Disability, each outstanding unvested Option granted to such Participant shall immediately terminate and expire, and each outstanding vested Option shall remain exercisable for one (1) year thereafter (but in no event beyond the expiration of the Option Period); and (C) a Participant's Termination for any other reason, each outstanding unvested Option granted to such Participant shall immediately terminate and expire, and each outstanding vested Option shall remain exercisable for ninety (90) days thereafter (but in no event beyond the expiration of the Option Period).

*Id.* at A37.

The Second and Third Option agreements provide for a potential exception to Section 6(c)(iii)'s rules regarding the fate of unvested options upon termination, further discouraging actions giving rise to for-cause termination. If terminated for cause, an award recipient's options are not subject to a "Tail Period" allowing options to vest for a further three-month period after the employee's termination date. *See id.* at A66 (Second Option Agreement § 3(a), at 4), A84 (Third Option Agreement § 3(a), at 4). The First Option Agreement does not have a "Tail Period" provision,

*4. The Several Use of "And" Aligns with the Scheme of the Plan*

*Fourth*, the meaning of the Call Right Provision that best aligns with the scheme of the Plan is the conjunctive, several interpretation.[106] Thus, we disagree with Weinberg's contention that her interpretation of the Call Right is "entirely consistent with ordinary executive compensation arrangements and serves a fulsome, rational contract purpose: to incentivize Appellant to abide by her Restrictive Covenant obligations, on pain of forfeiting her future upside participation in Appellees' companies."[107]

As Weinberg acknowledges, a typical and logical purpose of an equity incentive plan is to align employee incentives with those of the company.[108] Accordingly, call rights allow companies to "retire the shares of a departing shareholder who is no longer

---

presumably because options granted under that agreement were subject to an entirely different vesting schedule, with 98.95% of the options vesting on the date of the grant.

[106] *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) ("The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan.") (citing *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985))).

[107] Opening Br. at 19. She further contends that the Second and Third Option Agreements created a "structure of graduated sanctions culminating with Appellee's limited Call Right." *Id.* at 20.

[108] Even Weinberg observes in her Opening Brief that "[s]tock options are used as an incentive and retention tool for a company that anticipates substantial growth and for the individuals whose performance has a direct impact on the company's stock price." *Id.* (citing Stock Option: Overview, *Practical Law Practice Note Overview* w-008-0930); *accord Beard v. Elster*, 160 A.2d 731, 735–36 (Del. 1960) (stating the Delaware rule that "any option plan must contain consideration passing to the corporation, which could take variable forms, such as the retention of services of a valued employee, or the gaining of services of a new employee"); Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions*, 2 Law J. Press § 22.07[2] (2016) (observing that in an acquisition, existing options and stock grants of a target company may be rolled-over to become that of the acquirer and that, "[t]his has the benefit, from the acquiror's point of view, of continuing to incentivize management of the target company").

important to the success of the venture."[109] An employee is generally no longer important to a venture when they cease to be an employee, for any reason.[110] Weinberg argues that it is a reasonable aspect of the scheme of the Plan for her to hold company equity indefinitely as a mechanism to ensure loyalty to the restrictive covenants (which she is already contractually obligated to comply with). But Weinberg's contractual obligations in the Restrictive Covenant Agreements expire after specified time periods.[111] Absent being repurchased by Appellees, Weinberg could hold the Converted Units indefinitely.

Further, the Plan documents state that the purpose of the Plan is to attract and retain key personnel, with an end goal of "strengthening their commitment to the welfare of the Company Group and *aligning their interests with those of the Company's stockholders*."[112] The Second and Third Option Agreements provide that Weinberg's

---

[109] *See* COMMERCIAL CONTRACTS: STRATEGIES FOR DRAFTING AND NEGOTIATING § 19.03[G] (Vladimir R. Rossman & Morton Moskin eds., 2d ed. 2022).

[110] *See Stephenson v. Drever*, 947 P.2d 1301, 1304 (Cal. 1997) ("The typical buy-sell agreement provides for the mandatory or optional repurchase of a stockholder's shares by the corporation or by the other stockholders upon the occurrence of a certain event; the most common of the events that can trigger the repurchase are the stockholder's death or, if he is also an employee, his retirement or the voluntary or involuntary termination of his employment."); *Gallagher v. Lambert*, 74 N.Y.2d 562, 567 (N.Y. 1989) ("[Mandatory stock buy-back provisions with an employee shareholder] are designed to ensure that ownership of all of the stock, especially of a close corporation, stays within the control of the remaining corporate owners-employees; that is, those who will continue to contribute to its successes or failures.") (citing Kessler, *Share Repurchases Under Modern Corporation Laws*, 28 Fordham L. Rev. 637, 648 (1959–1960))); *Exercising Options to Repurchase Employee-Held Stock: A Question of Good Faith*, 68 Yale L.J. 773 (1959) ("Because a repurchase agreement is designed primarily to induce a valuable employee to remain with the company issuing the shares in question, an exercise of the option is almost always conditioned on termination of the employment relationship.") (internal footnotes omitted).

[111] *See, e.g.*, App. to Opening Br. at A291 (Restrictive Covenant Agreement § 4(a), at 2) (12-month restricted period), A311 (Restrictive Covenant Agreement § 5(c)(v), at 5) (18-month restricted period).

[112] *Id.* at A34 (the Plan at § 1) (emphasis added). The purpose provision reads in its entirety:

options were to vest upon two schedules: one based on her time at the company[113] and one based on whether the company achieved certain performance goals.[114] This structure indicates that the Option Agreements were meant to induce Weinberg both to continue her services to the company and to increase the company's value, as well as to benefit her own financial position.[115] Thus, we reject Weinberg's characterization of the Call Right as a sanction. We observe that Weinberg netted approximately $925,665 when Waystar repurchased her Converted Units.

*F. The Option Agreements are Unambiguous: The Doctrine of Contra Proferentum Does Not Apply*

*Finally*, Weinberg argues that the Call Right Provision is, at least, ambiguous. Accordingly, she asserts that we must apply the doctrine of *contra proferentum* because

---

**Purpose.** The purpose of [the Plan] is to provide a means through which the Company and other members of the Company Group may attract and retain key personnel and to provide a means whereby directors, officers, employees, consultants, and advisors of the Company and other members of the Company Group can acquire and maintain an equity interest in the Company, or be paid incentive compensation measured by reference to the value of Common Stock, thereby strengthening their commitment to the welfare of the Company Group and aligning their interests with those of the Company's stockholders.

[113] These options are referred to as "Time-Vesting Options." The Second and Third Option Agreements provide that 50% of the options are designated as Time-Vesting Options and that 20% of the Time-Vesting options will vest upon "each of the first five anniversaries" of the date the agreement was executed. *Id.* at A63 (Second Option Agreement §§ 1, 2(a), at 1), A81 (Third Option Agreement §§ 1, 2(a), at 1).

[114] The Second and Third Option Agreements provide when these options, "Performance-Vesting Options," will vest based on various performance hurdles, as measured on specified measurement dates. *Id.* at A63–64 (Second Option Agreement § 2(b), at 1–2), A81–82 (Third Option Agreement § 2(b), at 1–2).

[115] The First Option Agreement is a "Substitute Option Agreement" executed in connection with a merger transaction. 98.95% of the options granted under the First Option Agreement vested on the day of the grant, with the remaining subject to adjustment in connection with a final merger price. *Id.* at A53 (First Option Agreement § 2, at 2).

the Option Agreements, and the Partnership Agreement, are contracts of adhesion. However, for the reasons discussed above, we hold that the Call Right Provision is unambiguous and accordingly, *contra proferentum* does not apply.[116]

### V. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the Court of Chancery.

---

[116] *Daniel v. Hawkins*, 2023 WL 115854, at \*29 n.182 (Del. Jan. 6, 2023) (holding the trial court did not err in applying the rule of the last antecedent and other grammatical cannons where contract provision was ambiguous) (citing *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 341, 341 n.99 (collecting cases standing for the proposition that if a contractual provision is unambiguous, the court need not interpret it and the language of the provision itself controls)).